UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| HELEN CORFAIA SWANSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:14-CV-39-TAV-HBG |
| | ) | |
| SUMMIT MEDICAL GROUP, PLLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This civil action is before the Court on Defendant Summit Medical Group, PLLC's Motion for Summary Judgment [Doc. 25]. Plaintiff filed a response in opposition [Doc. 32], and defendant replied [Doc. 33]. The Court has carefully considered the matter and for the reasons stated herein, defendant's motion [Doc. 25] is **GRANTED** in part and **DENIED** in part.

## I.    Background

Plaintiff presents race discrimination claims against defendant, a provider of health care and laboratory services in East Tennessee [Doc. 1 ¶ 8]. As described herein, plaintiff asserts claims of disparate treatment, hostile work environment, and retaliation. Plaintiff's race discrimination and hostile work environment claims arise under both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-20-401, *et seq.* [*Id.* ¶¶ 60–68]. Plaintiff also alleges unlawful retaliation under Title VII, the THRA, Tennessee

common law, and the Tennessee Public Protection Act ("TPPA") [*Id.* ¶¶ 69–73].[1]

Defendant has moved for summary judgment on all of plaintiff's claims [Doc. 25].

### A.    Plaintiff's Work History at Fort Loudon Location

Plaintiff, an African-American female, began working at defendant's Fort Loudon,

Tennessee office (the "Loudon Office") through a temporary agency in September of

2010 and, after an initial ninety day probationary period, in December of that same year,

defendant hired plaintiff full time as a front office medical assistant [Doc. 25-2 p. 7].  At

that time, the Loudon Office was staffed by three physician partners: Randal Morton,

M.D. ("Dr. Morton"), Gail-Marie Walter, M.D. ("Dr. Walter"), and James Morse, M.D.

(Dr. Morse") [Doc. 25-1 p. 2].  Dr. Morton served as managing physician partner [*Id.*],

and the site manager was Jack Cross ("Mr. Cross") [*Id.* at 4].

Plaintiff's duties included working as a front desk receptionist, checking patients

in, assisting in the lab, and assisting providers [Doc. 25-2 pp. 11–13].  Her position did

not require any medical certifications [*Id.*], and she was the only African-American

employee in the office [Doc. 32-1 p. 23].  It is undisputed that, while plaintiff's initial

ninety day probation period passed free of any complaint, Dr. Walter expressed concern

about plaintiff's slow performance while assisting providers within plaintiff's first six

---

[1] Plaintiff filed her complaint against defendant on January 31, 2014 [Doc. 1]. On March 20, 2014, defendant filed a Partial Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure asking that plaintiff's claims for violations of Tenn. Code Ann. §§ 50-1-101, et. Seq., Tenn. Code Ann. §§ 50-1-701, et seq., Tenn. Code Ann. § 50-1-801, punitive damages under the Tennessee Human Rights Act ("THRA"), and request for liquidated damages under Title VII and the THRA be dismissed with prejudice [Doc. 13]. This Court granted defendant's Partial Motion to Dismiss on May 28, 2014 [Docs. 16, 17].

2

months with Summit Medical [Doc. 32-2 pp. 7–8]. Plaintiff acknowledges Mr. Cross communicated these concerns and encouraged her to pick up her pace [*Id.* at 14–15].

Annual evaluations for each Summit Medical employee occur around the anniversary date of the employee's hiring [Doc. 25-2 p. 17], so in the case of plaintiff December 13 of each year [*Id.*]. Each employee's evaluation score determines his or her annual raise [*Id.* at 18]. As the site manager, it was Mr. Cross's responsibility to complete an initial draft of plaintiff's 2011 evaluation [*Id.* at 13]. Mr. Cross breached site protocol, however, when he submitted plaintiff's 2011 evaluation to Summit Medical Human Resources before giving Dr. Morton, the site's managing physician, an opportunity to review it [Doc. 25-1 p. 3]. Plaintiff received 3.75 out of 4, categorized as a "noteworthy" performance, despite Dr. Walter's initial performance concerns [Doc. 25-2 pp. 14–15]. As a result, plaintiff received a raise from $14.50 an hour to $14.81 an hour [*Id.*]. In the individual notes portion of her 2011 evaluation, plaintiff expressed how "very happy and privileged [she was] to work at one of the greatest Summit Sites" and "with a group of people that . . . truly seems to have everyone's best interest at heart" [*Id.* at 15]. Plaintiff also praised their "awesome Site Manager (Jack Cross) who goes above and beyond to make sure his office staff and patients are taken care of" [*Id.* at 16].

## B. Plaintiff's Relationship with Supervisor Mr. Cross

While the exact date is unclear, at some time in 2012 Mr. Cross and plaintiff began carpooling to the Loudon Office from Knoxville [*Id.* at 43]. Mr. Cross eventually allowed plaintiff to keep his car for about a month [*Id.* at 4–5]. During that month,

plaintiff would pick Mr. Cross up in his own car and drive the two of them to work [*Id.* at 6].  In addition to the foregoing, plaintiff and Mr. Cross frequently ate lunch together [*Id.* at 9].  Plaintiff admits she brought Mr. Cross lunch on three or four occasions, but claims she would sometimes offer to bring other employees lunch as well [*Id.* at 10].  In light of the foregoing events, Dr. Walter and Dr. Morton became concerned about plaintiff and Mr. Cross's close relationship and the perception of that relationship in the eyes of the staff [Doc. 25-3 p. 17; Doc. 25-1 p. 5].  Dr. Walter first conveyed these concerns to Mr. Cross in early 2012 [Doc. 25-3 pp. 17–18].

### C.    Plaintiff's Performance Issues Regarding Scheduling

By spring of 2012, the Loudon Office began experiencing recurrent issues of improperly scheduled patient appointments [Doc. 25-2 pp. 31–32].  These errors involved patient appointments being too long or too short to address the type or number of medical conditions presented [*Id.* at 98].  Plaintiff acknowledges Dr. Morton personally observed her making patient scheduling errors on at least two occasions [*Id.* at 23], and that she had not had any problems with Dr. Morton in the year and a half of her employment prior to Spring 2012 [*Id.* at 19].  Plaintiff points to four comments between April and June of 2012 as proof her discriminatory treatment [*Id.* at 58–59].

First, in April 2012, Dr. Morton complained to Mr. Cross that plaintiff improperly scheduled a fifteen-minute appointment where a thirty-minute appointment was required [*Id.* at 22].  Mr. Cross in turn spoke to the plaintiff about the error and she corrected it

4

[*Id.*].  Plaintiff admits she scheduled the appointment incorrectly, [*Id.*], and Mr. Morton did not speak with her directly about the incident [*Id.* at 24].

Second, later that same month on April 20, 2012, plaintiff again scheduled a patient for a fifteen-minute appointment when the patient required a thirty-minute appointment [*Id.*].  While there is some dispute as to the tone of the conversation, plaintiff admits she made the error [Doc. 25-2 pp. 24, 27].  Plaintiff claims that Dr. Morton banged his fist on a table, pointed his finger at her, and exclaimed, "[d]on't you ever schedule another patient on my schedule incorrectly and not giv[e] me enough time to see them" [Doc. 25-2 p. 24].  In contrast, Dr. Morton describes the exchange as "firm" but "professional" [Doc. 32-2 pp. 16–17].

Third, two days later on April 22, 2012, Dr. Morton sent Mr. Cross an e-mail about another incorrectly scheduled injection appointment [*Id.* at 31–32].  In that e-mail, Dr. Morton noted that this was a recurrent problem among the entire staff, that the staff in general needed to be counseled on appropriate scheduling [*Id.*], and then went on to highlight that plaintiff in particular had recently scheduled two medical conditions incorrectly [*Id.* at 33].  In that same portion of the e-mail, Dr. Morton expressed concern plaintiff did "not have a good understanding of how to schedule patients appropriately" and "either . . . does not listen well or . . . does not understand well" [*Id.*].

It is undisputed Dr. Morton sent the foregoing e-mail to Mr. Cross alone [*Id.* at 34–35].  On April 23, 2012, however, Mr. Cross carbon-copied plaintiff and five other front office staff on the original e-mail between he and Dr. Morton when he sent out

instructions on how staff should properly schedule an injection appointment [*Id.*]  As a result, Dr. Morton's original e-mail became visible to all the copied parties, including plaintiff [*Id.* at 34].  Plaintiff agrees Dr. Morton's original e-mail does not appear to have been visible to the staff before Mr. Cross's reply [*Id.*], and it was not Dr. Morton's fault the e-mail ultimately went out to the front office staff [*Id.* at 35].  On April 24, 2012, Mr. Cross informed Dr. Morton that review of the scheduling errors revealed plaintiff had an equal number of scheduling mistakes as one of her coworkers and, together, those two accounted for the majority of errors [*Id.* at 100].

Finally, in May or June of 2012, plaintiff alleges Dr. Morton, under a mistaken belief she had incorrectly scheduled another patient [*Id.* at 28], banged his hand on the copier and exclaimed he was "sick and tired of [her] scheduling [his] patients incorrectly" [*Id.*].  Dr. Morton purportedly went on to say that she better "never [let it] happen again" [*Id.* at 28–29].  Plaintiff admits she did not have any other issues with Dr. Morton until August of 2012 [*Id.* at 46].

### D.    Proposed 2013 Salary Budget E-Mails

On August 20, 2012, Mr. Cross emailed Dr. Morton a proposed salary budget for 2013 [*Id.* at 47–48].  This proposed budget showed every staff member receiving the same 2.75% raise [*Id.* at 49].  Two days later, Dr. Morton responded with concern over plaintiff's proposed 2.75% raise and asked to see her 2011 evaluation [*Id.*].  While there is some dispute whether Dr. Morton objected to plaintiff's receipt of any raise at all [Doc.

6

32-2 p. 38], or just the same raise as her peers [Doc. 25-2 p. 48], it is undisputed Dr. Morton's email indicated his reservations were grounded in past performance issues [*Id.*].

In response to Dr. Morton's e-mail, Mr. Cross noted that each staff member's 2013 raise was based on their 2012 annual evaluation, which for the plaintiff would not be completed until December 2012 [*Id.* at 98]. He went on to explain that the proposed 2013 budget merely anticipated staff positions Summit Medical would need and was not intended as a proposed budget for any particular staff member [*Id.*].

### E. Discussion with Mr. Cross Regarding Relationship with Plaintiff

At some point during this same period, Dr. Morton approached Mr. Cross with his concerns about the staff's perception of Mr. Cross and plaintiff's relationship [*Id.* at 40]. Specifically, Dr. Morton explained that members of the staff believed plaintiff was receiving special treatment and was "untouchable" [*Id.*]. Dr. Morton followed with the statement that "there's a lot of animosity in the office towards her and it's people like her kind that tear up the workplace" [Doc. 32-1 p. 27]. It is undisputed plaintiff was not a party to this conversation and only learned of it from Mr. Cross after the fact [Doc. 25-2, p. 44]. Plaintiff acknowledges that Dr. Morton made the statement in the context of discussing the staff perception of her relationship with Mr. Cross [*Id.* at 44–45], and that the statement is neutral on its face[2] [*Id.* at 45]. Despite this admission, plaintiff maintains that both she and Mr. Cross perceived Dr. Morton's statement as racist [*Id.*]. Plaintiff

---

[2] Dr. Morton testified he told Mr. Cross it was people who take advantage of their special relationship with a superior that are the kind of people who tear up the office morale and create animosity among the staff [Doc. 25-1 pp. 7–8].

7

filed her first complaint with the Equal Employment Opportunity Commission ("EEOC") on August 27, 2012 [Doc. 32-1 p. 29]. Plaintiff acknowledges that Dr. Morton did not make any other comments or engage in any conduct toward her after August 21, 2012 [Doc. 25-2 p. 50].

## F.     Investigation by Summit Medical

Also during that same time period, on August 22, 2012, Mr. Cross e-mailed Summit Medical's Central Office inquiring about possibly transferring to another Summit Medical location and to raise concerns about Dr. Morton's conduct [Doc. 25-4 pp. 23–25]. Specifically, Mr. Cross expressed concern Dr. Morton's objection to plaintiff's allotted 2.75% raise in the proposed 2013 budget was based on the fact that she is an African American [*Id.* at 23]. Summit Medical initiated an investigation [*Id.* at 2].

On August 24, 2012, Summit Medical Human Resources Director Susan Loveday and Human Resources Manager Mike Fugate called Mr. Cross [*Id.* at 4]. During this telephone conversation, Mr. Cross noted Dr. Morton raised his concerns about perceptions of favoritism in the office and acknowledged he and plaintiff rode to work together [*Id.* at 5]. Mr. Fugate immediately advised Mr. Cross it was inappropriate behavior for a manager and subordinate to carpool together [*Id.*].

On August 27, 2012, Ms. Loveday went to the Loudon Office to further investigate and meet with plaintiff [*Id.* at 6]. Plaintiff recounted Dr. Morton's statements about "people like her tear[ing] up the workplace" and being "untouchable" [*Id.*].

Plaintiff filed her first charge of discrimination with the Tennessee Human Rights Commission ("THRC") this same day [Doc. 25-2 p. 88; Exhibit 7].

On August 29, 2012, Ms. Loveday interviewed Dr. Morton [Doc. 25-4 p. 9]. Dr. Morton reiterated his concerns about the close relationship between Mr. Cross and plaintiff [*Id.* 9–10]. According to Ms. Loveday, Dr. Morton responded to one of her questions with the statement that he was from "white downtown Birmingham" [Doc. 32-3 pp. 8–9]. Dr. Morton denies ever having made such a statement [Doc. 32-2 pp. 56–57]. Ms. Loveday also interviewed Dr. Walter [Doc. 25-4 p. 11], and was informed that Dr. Walter first raised her concerns about the perception of Mr. Cross and plaintiff's relationship with Mr. Cross six months earlier [*Id.* at 12]. Based on the information gathered, Ms. Loveday concluded Dr. Morton had not engaged in any inappropriate conduct based on plaintiff's race [*Id.* at 14–15].

### G.    Plaintiff's 2012 Annual Evaluation and Reprimand

In October of 2012, Dr. Morton called a meeting of the staff and announced his relationship with Summit Medical as a physician partner would end on October 31 [Doc. 25-3 p. 19]. According to plaintiff, later that same day one of the staff members, Nakita Rodriguez, asked her "how can somebody eat at [a] time like this, especially when you know it's your fault that [Dr. Morton is] leaving" [Doc. 32-1 p. 37].

As a result of Dr. Morton's departure, Dr. Walter became managing physician at the Loudon Office [Doc. 25-3 p. 19]. At some point thereafter, Dr. Walter asked Mr. Cross to include her in future employee annual evaluations [Doc. 25-2 p. 55; Exhibit 11].

Prior to the December 13, 2012 due date for her 2012 evaluation, plaintiff was involved in an incident with her front office supervisor, Tonya Harvey [Doc. 25-3 p. 6]. Specifically, on December 12, 2012, a physician's assistant asked Ms. Harvey why there was a delay with one of her patients [Doc. 25-2 p. 143; Exhibit 17]. Ms. Harvey in turn asked plaintiff, who checked in the patient originally, about why there was a delay taking the patient from the lobby to the physician assistant [*Id.*]. Plaintiff responded by raising her voice and instructing both co-workers that they should "stop trying to go around [her] to keep from talking to [her] and contact the person directly with the patient" [Doc. 32-1 p. 55]. Plaintiff admits she was not directly speaking to anyone [*Id.*], but instead made the comment at issue while walking away from her station to go speak with Mr. Cross [*Id.* at 55–56]. According to Dr. Walter, these comments could be heard down the hallway in the scale area and as a result, Ms. Harvey was concerned that patients had witnessed the behavior as well [Doc. 25-3 p. 6].

Because Dr. Walter did not know whether to include the incident in plaintiff's 2012 evaluation, she sought guidance from Summit Medical's Central Office [*Id.*]. Summit Medical's Central Office in turn instructed that the reprimand occur before completion of plaintiff's evaluation [*Id.*]. Plaintiff admits she made the comment for which she was reprimanded, did so while leaving her post to talk with Mr. Cross about the incident and spoke loud enough that others in the area could hear [Doc. 25-2 p. 65]. It is likewise undisputed that plaintiff's reprimand was proper under Summit Medical policy [Doc. 25-4 p. 16]. Mr. Cross downgraded what was originally a written reprimand

10

to an oral one for acting in a "discourteous and unsatisfactory manner" [*Id.* at 119; Exhibit 11].

After Dr. Walter returned from vacation, Mr. Cross provided her with a copy of plaintiff's 2012 evaluation for review [Doc. 25-3 p. 8]. After reviewing the evaluation, Dr. Walter revised three of plaintiff's scores [*Id.* at 12]. Dr. Walter changed two scores from four to three, categorized as "good," and added comments noting that there had been instances of plaintiff leaving patients in the lobby too long [*Id.*]. Dr. Walter also inserted a comment noting some of plaintiff's coworkers had complained she was rude to them when approached about patients being left in the lobby [*Id.* at 11]. In addition to the foregoing, Dr. Walter changed plaintiff's confidentiality score from a four to a three [*Id.* at 12]. Dr. Walter claims she made this final reduction based on the fact no employees ever received above a three on confidentiality [*Id.* at 9]. After the evaluation had been completed, but prior to her receipt of that evaluation, plaintiff filed her second charge of discrimination with the THRC on January 8, 2013 [Doc. 25-2 p. 115; Exhibit 11].

On January 1, 2013, Summit Medical Human Resources launched new evaluation software and, as a result of this new system, all of plaintiff's data had to be reentered into the Loudon Office system before her completed evaluation could be issued [Doc. 25-3 p. 13; Doc. 25-2 p. 119; Exhibit 11]. Plaintiff ultimately received her 2012 evaluation on January 21, 2013 [Doc. 25-3 pp. 13, 16; Exhibit 5]. In that evaluation, plaintiff received an overall performance score of 3.25, categorized as "good," and as a result, a raise from

11

$14.81 an hour to $15.22 an hour [Doc. 25-2 pp. 74–75; Exhibits 16, 19]. Plaintiff acknowledges the raise was retroactively applied to her December 13, 2012 anniversary date [*Id.*].

While the exact timing is unclear, at some point after the first of the year, another Summit Medical front staff employee, Nakita Rodriguez, had an incident at work in which she stormed into Mr. Cross's office, exclaimed that she could no longer handle her workload, and left work without permission [Doc. 25-3 pp. 2-5]. Again, while there is some dispute about exactly how long, at minimum, several weeks passed before Ms. Rodriguez was disciplined for the incident [*Id.* at 25]. It is undisputed, however, the delay arose from Dr. Walter's decision to check whether reprimand was appropriate with Summit Medical Human Resources Department [*Id.* at 26], Ms. Rodriguez was eventually issued a written reprimand for leaving work without permission [*Id.*], and the discipline was appropriate pursuant to Summit Medical Policy [Doc. 25-4 p. 18].

## H. Reduction-in-Force after Departure of Dr. Morse

By February 1, 2013, Dr. Morse had transferred to another Summit Medical location, leaving Dr. Walter as the only physician provider at the Loudon Office [Doc. 25-2 p. 71]. As a result, Dr. Walter was forced to reduce the number of staff at that location [Doc. 25-3 p. 22]. Summit Medical Human Resources helped identify which positions to eliminate by reference to which positions constituted necessary support and then seniority [Doc. 25-4 pp. 19–20].

12

Based on reference to the American Medical Group Association ("AMGA") guidelines regarding provider-to-staff ratios, Summit Medical determined three positions would be terminated [Doc. 25-4 p. 20]. On February 27, 2013, three front office personnel were laid off from the Fort Loudon location: plaintiff, Vanessa Wells, and Ronda Kirkland [Doc. 25-3 pp. 22–23]. Plaintiff admits that both Vanessa Wells and Rhonda Kirkland are Caucasian and had been at the Loudon Office longer than plaintiff [Doc. 25-2 pp. 71–72]. When approached, Vanessa Wells purportedly told plaintiff not to "say anything to [her], because if it wasn't for [plaintiff], [they] would not be losing [their] job[s]" [Doc. 32-1 p. 37]. Plaintiff filed her third and final complaint with the THRC on May 20, 2013 [Doc. 25-2; Exhibit 6].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis

of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. Race Discrimination Under Title VII and THRA

In Title VII actions, "a plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *DiCarlo v. Potter*, 358 F.3d 408

14

(6th Cir. 2004) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)),

*overruled on other grounds by Gross v. FBL Fin. Sevs.*, 557 U.S. 167, 180 (2009). "The

direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff

need only prove one or the other, not both." *Kline*, 128 F.3d at 348–49. Under the direct

evidence approach, once the plaintiff introduces evidence that the employer terminated

her because of her race, the burden of persuasion shifts to the employer to prove that it

would have terminated the plaintiff even had it not been motivated by discrimination.

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994) (citing

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45 (1989)), *overruled on other grounds

by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). In contrast,

under the circumstantial evidence approach, "the familiar *McDonnell Douglas-Burdine*

tripartite test is employed." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir.

2000).

Defendant asserts that because there is no direct evidence of discriminatory intent

in this case, plaintiff's claim should be analyzed under the *McDonnell Douglas*

framework; plaintiff does not appear to dispute this conclusion [Docs. 25, 32]. Under

this framework, a plaintiff carries the initial burden of establishing, by a preponderance

of the evidence, a *prima facie* case of discrimination by his or her employer. *See

generally Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell

Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order to demonstrate a *prima facie*

case, the plaintiff must show: (1) membership in a protected class; (2) that the plaintiff

15

suffered an adverse employment action; (3) that the plaintiff was qualified for the position; and (4) that the plaintiff was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). In reduction-in-workforce cases where "the most common legitimate reason for the termination is" the reduction itself, "the fourth factor of the prima facie burden requires 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Nelson v. Gen. Elec. Co.*, 2 F. App'x 425, 430 (6th Cir. 2001) (citations omitted). A plaintiff who successfully establishes a *prima facie* case receives the benefit of a presumption that the employer unlawfully discriminated against the plaintiff. *Burdine*, 450 U.S. at 254.

Once the plaintiff satisfies this *prima facie* burden, the burden of production "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* Although the burdens of production shift throughout the *McDonnell Douglas* framework when circumstantial evidence is involved, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*(citations omitted); *see also Reeves*, 530 U.S. at 142–43 (noting

liability in a disparate treatment action ultimately depends on whether the plaintiff's protected trait "actually played a role in [the employer's] decision making process and had a determinate influence on the outcome" (alteration in original)). Because the foregoing standards also apply to claims arising under the THRA, the Court will address plaintiff's Title VII and THRA claims simultaneously. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (citing *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)).

Plaintiff's response broadly breaks down her disparate treatment claims into two subcategories: (1) her interactions with Dr. Morton and (2) subsequent treatment by Dr. Walter after Dr. Morton's departure from Summit Medical [Doc. 32 pp. 13–19].

With regard to the first subcategory, plaintiff appears to argue Dr. Morton's two public outbursts over scheduling errors amounted to disparate treatment because, despite being informed by Mr. Cross that other employees were also responsible for scheduling errors, Dr. Morton never "questioned, confronted or admonished [anyone else]" [*Id.* at 19]. Plaintiff also points to the fact that Dr. Morton's April 22, 2012 e-mail to Mr. Cross singled out plaintiff despite the fact that other staff members were responsible for errors as well [*Id.* at 18]. Finally, plaintiff cites Dr. Morton's August 22, 2012 refusal to sign off on the 2013 salary budget based on plaintiff's allotted 2.75% raise as further proof of his discriminatory prejudice [*Id.* at 19].

17

With regard to the second subcategory of events, plaintiff argues that Dr. Walter's subsequent decision to allow Ms. Harvey to write up plaintiff over "a conversation that took place between [them]" and for which Ms. Harvey was "engaged in the same activity, at the same time" amounted to disparate treatment in violation of Title VII [*Id.* at 14]. Plaintiff also points to the fact that none of her coworkers were disciplined for "gossiping" about a perceived relationship between her and Mr. Cross despite the fact that Ms. Loveday testified that staff gossip violated Summit Medical policy [*Id.* at 15–16]. Finally, plaintiff argues Dr. Walter's alteration of her 2012 evaluation scores amounted to adverse employment action [*Id.*].

For the purposes of establishing plaintiff's *prima facie* case, it is undisputed that plaintiff, an African-American female, is a member of a protected class, *see Wright*, 455 F.3d at 706 (recognizing that an African-American male was a member of a protected class for Title VII purposes), and that plaintiff was generally qualified for her position as a medical assistant with Summit Medical. Defendant asserts that plaintiff cannot establish a *prima facie* case of Title VII race discrimination because plaintiff cannot establish that plaintiff suffered adverse employment action or that she was replaced by someone outside the protected class or treated less favorably than a similarly situated individual outside of the protected class [Doc. 31]. Defendant also asserts that, assuming plaintiff can establish a *prima facie* case of disparate treatment, plaintiff has failed to put forth any evidence demonstrating defendant's proffered legitimate business reasons are pretextual [*Id.*].

18

## A.     Interactions with Dr. Morton

Defendant argues plaintiff has failed to present any genuine issue of material fact that might demonstrate disparate treatment by Dr. Morton.  First, defendant argues plaintiff has failed to put forth any evidence that suggests she was treated less favorably than similarly situated Caucasian employees when Dr. Morton admonished her for committing multiple scheduling errors [*Id.* at 17–18, 21], or that Dr. Morton's objection to the 2013 salary budget resulted in adverse employment action [*Id.* at 21–22].  Second, defendant argues, even assuming plaintiff is able to establish a *prima facie* case of disparate treatment with regards to Dr. Morton's budget objection or confrontation of plaintiff over errors in scheduling, Dr. Morton's lone comment about the plaintiff's "kind . . . tear[ing] up the workplace" is insufficient to prove defendant's proffered legitimate business reasons for such conduct were pretext [*Id.* at 19–21].

### 1.     Scheduling Errors Between April and June 2012

As discussed above, defendant initially argues that plaintiff has failed to demonstrate Dr. Morton's admonishment of plaintiff for scheduling errors differed from his treatment of other similarly situated Caucasian employees [Doc. 31 pp. 17–18]. Specifically, defendant notes all of Dr. Morton's comments regarding scheduling errors were grounded in performance based concerns and, as a result, cannot be construed as based on plaintiff's race [*Id.* at 18].  Defendant goes on to argue, while it is true that scheduling errors were a recurrent problem throughout the staff in general, plaintiff has

failed to put forth any evidence suggesting that Dr. Morton personally witnessed anyone other than plaintiff make such mistakes [*Id.* at 18–19].

The Sixth Circuit has made clear a plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly situated." Rather, a plaintiff need only show they are similar in all relevant aspects. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). To be deemed "similarly situated," the non-protected individuals with whom the plaintiff seeks to compare her treatment must have: (1) "dealt with the same supervisor"; (2) "been subject to the same standards"; and (3) "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The Sixth Circuit has held that under Title VII, "[d]ifferences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Leadbetter v. Gilley*, 385 F.3d 683, 691–92 (6th Cir. 2004) (finding plaintiff was not similarly situated to a non-protected employee with "superior experience").

Plaintiff falls short of the foregoing standard and cannot rely on Dr. Morton's scheduling criticisms as proof of disparate treatment. While it is true plaintiff was not the only front office staff member to make scheduling errors and all of the front office staff were subject to the same supervisor standards of performance, plaintiff has failed to put

forth any evidence that suggests Dr. Morton personally observed anyone other than plaintiff make such errors. Because plaintiff has failed to identify any other similarly situated individual with whom she seeks to compare her treatment, she cannot rely upon Dr. Morton's performance based criticisms as proof of disparate treatment. *See, e.g.*, *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment."); *Johnson v. Sinai Hosp. of Greater Detroit*, No. 4:10-CV-12321-DT, 2012 WL 219506, at *8 (E.D. Mich. Jan. 6, 2012) (noting plaintiff failed to point to specific evidence of similar performance problems with the employees she claimed were similarly situated and subjective beliefs were insufficient to support a finding of discrimination) (report and recommendation adopted by *Johnson v. Sinai Grace Hosp.*, No. 10-CV-12321, 2012 WL 220223 (E.D. Mich. Jan. 25, 2012)).

## 2. Objection to the 2013 Proposed Salary Budget

Defendant next argues that plaintiff cannot show Dr. Morton's conduct resulted in adverse employment action. Defendant primarily relies on the fact that Dr. Morton's August 22, 2012 objection to Mr. Cross's proposed 2013 salary budget had no discernable effect on plaintiff's 2013 raise [Doc. 31 pp. 17–22; Doc. 33 pp. 5–8]. Specifically, defendant reasons Dr. Morton's comments cannot be characterized as adverse employment action because the undisputed facts show each employee's annual raise is calculated based upon his or her annual evaluation, not Summit Medical's proposed salary budget [Doc. 31 pp. 21–22]. As a result, Dr. Morton's August 22, 2012

21

objections could not have effected completion of plaintiff's evaluation nearly two full months after he left Summit Medical [*Id.*]. Defendant also notes plaintiff received a 2.75% raise from $14.81 to $15.22 an hour, the maximum amount allowed per employee in Mr. Cross's original budget proposal [*Id.*].

"To establish a prima facie case, [plaintiff] must show, among other elements, that [she] suffered an adverse employment action, that is, an action 'that results in a materially adverse change in the terms and conditions of plaintiff's employment 'such as a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities.'" *Love v. Elec. Power Bd. of Chattanooga*, 392 F. App'x 405, 408 (6th Cir. 2010) (quoting *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007)). Dr. Morton's objection to Mr. Cross's proposed 2013 salary budget falls short of this standard. Plaintiff acknowledges each employee's raise is determined by his or her annual evaluation, and plaintiff's annual evaluation in particular was not due until December 13, 2012, almost two months after Dr. Morton left Summit Medical. As a result, plaintiff has failed to present any evidence that Dr. Morton's August 22, 2012 email to Mr. Cross had any impact on the subsequent calculation of her 2013 raise. Even assuming plaintiff could prove Dr. Morton's objection to the proposed budget impacted the calculation, plaintiff admits she ultimately received the full 2.75% raise allowed in Mr. Cross's original proposal. Thus, Dr. Morton's objection to the proposed 2013 budget cannot be characterized as adverse employment action and cannot serve as the basis of a disparate treatment claim.

22

## B. Treatment by and Interactions with Dr. Walter

Next, defendant argues plaintiff has failed to present any genuine issue of material fact demonstrating disparate treatment by Dr. Walter. First, defendant argues the undisputed facts again demonstrate that plaintiff was not treated differently than any similarly situated non-African-American employees [*Id.* at 23–25]. Second, defendant argues Dr. Walter's December 2012 reduction of plaintiff's annual evaluation score did not amount to adverse employment action [Doc. 31 pp. 22–24].

### 1. Oral Reprimand for December 12, 2012 Incident

Defendant argues that, even assuming she could establish her December 12, 2012 oral reprimand for acting in a "discourteous and unsatisfactory manner" amounted to adverse employment action, plaintiff has failed to put forth any evidence that suggests she was treated differently than similarly situated non-African-American employees [Doc. 31 pp. 24–25].

In response, plaintiff points to two ways that she was reprimanded differently than similarly situated employees. First, plaintiff objects to the fact that she received an oral reprimand for her December 12, 2012 exchange with Ms. Harvey when Ms. Harvey was not disciplined as a result of the same incident [Doc. 1 ¶¶ 35, 38, 40, 62]. Second, plaintiff objects to the fact that she received her oral reprimand fifteen days after the alleged infraction when another Loudon Office employee, Nakita Rodriguez, did not receive a written reprimand for her decision to yell in the office and leave work without permission until several weeks after the incident occurred [*Id.* ¶¶ 41, 42, 44–46].

23

Plaintiff also appears to argue that her conduct was somehow less deserving of reprimand than Ms. Rodriguez's conduct [*Id.*].  Defendant counters that plaintiff's claim should fail because she cannot establish she and Ms. Harvey were similarly situated or the delay in Ms. Rodriguez's reprimand rose to the level of disparate treatment [Doc. 33 pp. 7–8].

As discussed above, the fourth element of a disparate treatment claim can be satisfied "'by showing that similarly situated non-protected employees were treated more favorably.'"  *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 511 (6th Cir. 2004) (quoting *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1246 (6th Cir. 1995)). Co-workers are deemed "similarly situated" where they (1) "dealt with the same supervisor, . . . [(2) were] subject to the same standards, and [(3)] . . . engaged in the same conduct without such differentiating or mitigating circumstances which would distinguish their conduct or the employer's treatment of them for that conduct." *Conti v. Universal Enters.*, 50 F. App'x 690, 699 (6th Cir. 2002) (citing *Ercegovich*, 154 F.3d at 352).  While it is undisputed plaintiff and Ms. Harvey shared the same supervisor and standards of conduct, plaintiff has failed to demonstrate Ms. Harvey participated in any analogous sanctionable conduct. It is undisputed Ms. Harvey was plaintiff's front office supervisor at the time of the incident and plaintiff raised her voice in objection to Ms. Harvey's question about why patients were waiting so long in the lobby.  Plaintiff admits she was not speaking to anyone, but instead made the comment at issue while walking away from her station to go speak with Mr. Cross.  It is likewise undisputed plaintiff's reprimand for discourteousness was proper under Summit Medical policy.  Because plaintiff has failed

to present any evidence that Ms. Harvey committed an analogous violation of Summit Medical policy, no reasonable fact finder could categorize the two as "similarly situated" for purposes of a disparate treatment claim.

In contrast, with regard to plaintiff's second claim, both plaintiff and Ms. Rodriguez are similarly-situated employees subject to the same standards of conduct and supervisory authority. It is undisputed, however, that both plaintiff and Ms. Rodriguez's conduct constituted violations of Summit Medical policy, that both parties received reprimands, and that neither reprimand was immediate. In fact, plaintiff did not receive her reprimand until fourteen or fifteen days after her infraction [Doc. 25-3 p. 6]. Further, plaintiff does not present any evidence contesting Dr. Walter's explanation for the lengthy delay in issuance of Ms. Rodriguez's punishment and it is undisputed Mr. Cross reduced plaintiff's reprimand from written to oral, relief which was not afforded to Ms. Rodriguez. Thus, while plaintiff and Ms. Rodriguez can be categorized as similarly situated, no reasonable trier of fact could conclude that they were treated differently.

### 2.    Reduction of Initial 2012 Evaluation Scores

Next, defendant argues Dr. Walter's reduction of three of plaintiff's 2012 evaluation scores from fours to threes cannot constitute adverse employment action because the alteration did not impact plaintiff's 2013 raise and, as a result, did not diminish plaintiff's wage or salary [Doc. 31 p. 22]. Specifically, defendant notes Mr. Cross's proposed 2013 salary budget anticipated uniform 2.75% raises for all Summit Medical front office staff and plaintiff's subsequent raise from $14.81 an hour to $15.22

an hour fully matched that proposed increase [*Id.*]. Defendant goes on to note, even assuming plaintiff's 2012 evaluation and corresponding raise were found to constitute adverse employment action, Dr. Walter provided legitimate, nondiscriminatory reasons for each revision [*Id.* at 23]. Defendant notes the reductions to the "clinical skills" and "adheres to company policy" categories were accompanied by notations about plaintiff leaving patients in the lobby too long and being rude to coworkers [*Id.*]. Defendant also points to the fact that reduction of the plaintiff's confidentiality score from a four to a three brought the score in line with Summit Medical's policy that no employees receive a confidentiality score above three [*Id.*].

While it is true the Sixth Circuit has recognized downgraded employee evaluations can constitute adverse employment action for purposes of Title VII and the THRA disparate impact claims, *see White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008) (finding that plaintiff survived summary judgment where he put forth enough evidence to give rise to a factual question about whether his reduced evaluation adversely impacted his wages), such recognition is limited to circumstances where the reduced "'evaluation has an [actual] adverse impact on [the] employee's wages or salary.'" *Tuttle v. Metro Gov't*, 474 F.3d 307, 322 (6th Cir. 2007) (citing *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999)); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 565 (6th Cir. 2000) (accepting that the denial of an employee's proper pay increase constituted an adverse employment action). In the current case, it is undisputed Mr. Cross's proposed 2013 salary budget anticipated uniform 2.75% raises for all front office

staff and plaintiff received a full 2.75% retroactive raise on January 21, 2013. Because plaintiff has failed to put forth any evidence that suggests her reduced 2012 elevation score impacted her raise in any way, plaintiff cannot rely on alteration of that evaluation to establish disparate treatment. *See Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (holding negative criticism or performance evaluation, unaccompanied by a materially adverse change in the terms or conditions of employment, does not constitute adverse employment action).

### 3. February 2013 Reduction-in-Force

Based on the foregoing, termination from Summit Medical as part of the February 2013 reduction-in-force is the only adverse employment action plaintiff can establish resulted from either Dr. Morton or Dr. Walter's conduct. *See Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (noting a "work-force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company"). As discussed above, when the sole source of adverse employment action is termination as part of a reduction-in-workforce, the fourth element of a *prima facie* case of disparate treatment requires "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Nelson*, 2 F. App'x at 430; *see also Payne v. Goodman Mfg. Co., L.P.*, 726 F. Supp.2d 891, 901 (E.D. Tenn. 2010) (noting this additional proof requirement supplants the replacement prong because reductions-in-force generally involve redistribution of the terminated employees duties among remaining workers).

27

Plaintiff admits her termination by Summit Medical in February of 2013 resulted from a reduction-in-workforce [Doc. 25-2 p. 71], and that reduction was the necessary consequence of Dr. Morton and Dr. Morse's departure, leaving Dr. Walter as the sole physician at the Loudon Office [*Id.*]. Plaintiff further acknowledges the other two front office staff, Vanessa Wells and Ronda Kirkland, were Caucasian and had worked at the Loudon Office longer than plaintiff [Doc. 25-2 pp. 71–72].

The only fact plaintiff appears to point as additional circumstantial evidence of Summit Medical's discriminatory animus is Dr. Morton's August 22, 2012 comment that the plaintiff's "kind . . . tear up the workplace" [Doc. 32-1 p. 37]. In fact, plaintiff goes so far as to identify this statement as the "biggest thing" that was done to discriminate against her [Doc. 25-2 pp. 58–59]. Even if Dr. Morton's comment is assumed to have been a reference to race, plaintiff's has failed to present any evidence that would suggest his opinion had any impact on her inclusion in a reduction-in-workforce over four months after his departure from Summit Medical. *See Boyd v. State Farm Ins.*, 158 F.3d 326, 329 (5th Cir. 1998) (holding absent a causal link between supervisor's isolated racial remarks and employer's employment decision, stray remarks cannot support a discrimination verdict), *cert. denied*, 526 U.S. 1051 (1999); *see also Thomas v. St. Francis Hosp. and Med. Ctr.*, 990 F. Supp. 81, 87 (D. Conn. 1998) (granting summary judgment for defendant in disparate treatment action where only indicia of discrimination was single past racist remark).

Even with the evidence viewed in the light most favorable to the non-moving party and with all inferences drawn in her favor, *see Nguyen v*, 229 F.3d at 562 ("When reviewing a motion for summary judgment, the court must view all of the evidence and any inferences that may be drawn from that evidence in the light most favorable to the non-moving party."), plaintiff fails to present a *prima facie* case of disparate treatment based upon her inclusion in the reduction.

For all the reasons discussed, defendant's motion for summary judgment is **GRANTED** with respect to plaintiff's Title VII and THRA disparate treatment claims. Because the Court finds plaintiff has not met the second or fourth prongs of her *prima facie* case,[3] it need not address whether defendant presented a legitimate reason for any alleged adverse employment action.

## IV. Hostile Work Environment Under Title VII and THRA

The *McDonnell Douglas* burden-shifting analysis also applies to Title VII and THRA hostile work environment claims. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007); *see also Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31–32 (Tenn. 1996) (demonstrating that THRA test for hostile work environment claims tracks the Title VII standard). For plaintiff to succeed on a racially hostile work environment claim,

---

[3] Plaintiff argues in passing that the Court should alternatively evaluate her claim under the mixed motive framework set forth by the Sixth Circuit in *Baxter Healthcare Corp.*, 533 F.3d at 400 [Doc. 32 p. 17]. The *McDonnell Douglas-Burdine* burden shifting framework does not apply in such cases and plaintiff instead need only establish (1) defendant took an adverse employment action against her and (2) race was "*a* motivating factor" for that adverse action. *Id.* Plaintiff, however, falls short of this standard as well because the only adverse employment action incurred was termination as part of the reduction-in-force and plaintiff has failed to present any evidence that would allow a reasonable juror to conclude her race was a motivating factor in that determination.

she must demonstrate "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citation omitted).

Plaintiff cites numerous exchanges in support for her hostile work environment claim. Specifically, she references Dr. Morton's recognition of a "lot of animosity in [the] office toward [plaintiff]" and, based upon Dr. Morton's subsequent comment "people like her kind . . . tear up the workplace," argues the animosity referenced in such statement was based on her race [Doc. 32-1 p. 27]. As additional support, Plaintiff cites several instances of coworker hostility, i.e., when she was told it was her "fault that Dr. Morton [left Summit Medical]" [*Id.* at 56–57], and "[several staff members were] . . . losing their jobs" [*Id.* at 37]. Plaintiff alleges "Dr. Morton made it very well known that he was treating [plaintiff] differently and encouraged other[] [staff members] to shun [plaintiff]"; she claims "other employees . . . ostracized [her] [based on this instruction and the fact] Dr. Morton told them to be careful about . . . spending time with her" [Doc. 32 at 9].

In light of the foregoing, the Court finds plaintiff has presented evidence from which a reasonable juror could conclude she belonged to a protected group and was subjected to unwelcome harassment based on her race. Further, the various portions of deposition testimony addressing the internal investigation [Doc. 25-4 pp. 6, 23; Doc. 31-3

30

pp. 8–9] could allow a reasonable juror to conclude Summit Medical failed to intervene despite knowledge of the harassment. The only question that remains is whether the harassment was sufficiently pervasive to create an abusive working environment.

While defendant argues no one could conclude the foregoing comments gave rise to a workplace objectively "permeated with discriminatory intimidation, ridicule, and insult . . . so severe or persuasive to alter the conditions of [plaintiff's] employment" [Doc. 31 pp. 25–28], plaintiff retorts that the evidence is more than sufficient to support a verdict against Summit Medical when read in light of Dr. Morton's comments about being "sensitive to the litigious environment in which we live" [Doc. 32-2 pp. 39–40], aware of "the racial tensions that we have in this country" [*Id.* at 40], and from "white downtown Birmingham" [Doc. 32 pp. 24, 26–27].

To survive summary judgment, a plaintiff must present evidence sufficient for a reasonable juror to conclude the harassing conduct was "severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). The question of "whether an environment is [objectively] 'hostile' or 'abusive' can only be determined by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Thus, contrary to the protocol in disparate treatment or retaliation charge claims, a court should consider the combined harassment "by all perpetrators" instead of "divid[ing] and categoriz[ing] the reported incidents [by time and participant]." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (discussing foregoing rule in context of sex-

31

based hostile work environment); *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (explaining "same principles that govern sexual harassment also govern claims of racial harassment.").

When the various supervisor and coworker statements presented by plaintiff are viewed as a whole and Dr. Morton's conduct in particular is viewed in the context of his subsequent statements to Ms. Loveday, the Court finds plaintiff has presented sufficient evidence to give rise to a genuine issue of material fact regarding the presence of an objectively hostile work environment. While Summit Medical appears to focus on the fact that none of the statements made directly to plaintiff expressly reference race [Doc. 31 p. 26], it is well established that race-based "harassment [can be proven] . . . by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998) (approving these methods in the analogous context of sexual harassment)). As a result, the harassment need not be explicitly based on race to be illegally race-based if the plaintiff shows that but for her race she would not have been subjected to the harassment. *Clay*, 501 F.3d at 706. For purposes of summary judgment review, Plaintiff has met this standard. *Cf. CSX Transp.*, 643 F.3d at 512 (finding no reasonable jury could conclude plaintiff's allegations of adverse treatment was based on race where plaintiff presented insufficient evidence to compare her treatment with that of her white co-workers).

While it is true isolated incidents are usually insufficient to show a hostile work environment actionable under Title VII or the THRA, *see Faragher v. City of Boca Raton*, 524 U.S. 777, 788 (1998) (noting "offhand comments and isolated incidents (unless extremely serious) will not [suffice under Title VII]"); *Duran v. LaFarge N. Am.*, 855 F. Supp. 2d. 1243, 1249 (D. Co. 2012) (rejecting hostile work environment claim based on single past comment in which plaintiff was referred to as a "dirty Mexican" by a co-worker), frequency of discriminatory conduct is only one factor to be considered, *Harris*, 510 U.S. at 23. Other factors include "whether [the conduct was] . . . humiliating, or a mere offensive utterance; and whether [such conduct] unreasonably interfere[d] with[the] employee's work performance." *Id.* A reasonable juror could find that Dr. Morton's treatment of plaintiff was based on her race. A reasonable juror could also conclude that plaintiff's repeated public admonishment [Doc. 25-2 pp. 24, 28–29, 33–34] and social isolation [Doc. 32 p. 9] were humiliating. In light of the multitude of harassing comments cited by plaintiff, the fact that plaintiff learned of Dr. Morton's comment about her kind being "untouchable" and "tearing up the workplace" second-hand does not preclude a reasonable juror from finding pervasive harassment. *Cf. Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007) (noting second-hand comments are generally viewed as "less credible, . . . less confrontational, . . . less wounding" and thus, less likely to create an objectively hostile work environment "than offense[s] based on [plaintiff's own firsthand perception]"). Dr. Morton's status as plaintiff's supervisor only exacerbates the impact his conduct might have had upon the workplace. *Compare*

33

*Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998) (explaining identity of speaker is relevant to impact of workplace remark and noting an "isolated discretionary remark made by one with no managerial authority . . . is not considered indicative of . . . discrimination"); *with Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 477 (6th Cir. 2009) (noting racial remarks by person in position of power "can dominate the workplace . . . and . . . affect the entire workplace with . . . racial animus"). Based on the foregoing, plaintiff has identified a genuine issue of material fact requiring resolution by a finder of fact and her claims for hostile work environment survive summary judgment.

Accordingly, for the reasons explained above, defendant's motion for summary judgment is **DENIED** with respect to plaintiff's hostile work environment claims.

## V.      Retaliation

The *prima facie* elements of a retaliation claim are similar but distinct from those of a discrimination claim. Plaintiff must show she (1) engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007). Similar to the disparate treatment context, once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for imposing the challenged [adverse employment action]." *Id.*

34

at 597.  Satisfaction of the defendant's burden in turn shifts the burden of proof back to the plaintiff, requiring presentation of evidence that would allow a reasonable juror to conclude the "proffered reasons were actually a pretext to hide unlawful retaliation."  *Id.*

Defendant argues plaintiff cannot establish a *prima facie* case of unlawful retaliation for two reasons [Doc. 31 pp. 28–33].[4]  First, defendant argues neither plaintiff's December 12, 2012 oral warning nor subsequent annual evaluation constitutes adverse employment action cognizable under Title VII or the THRA [*Id.* at 29–32]. Second, defendant argues plaintiff has failed to present any evidence suggesting her EEOC or THRA activities were the "but-for" cause of the oral reprimand, 2012 performance ratings, or her subsequent termination as part of the reduction-in-force [*Id.* at 29–33].

### A.      Oral Reprimand for December 12, 2012 Incident

Defendant first argues plaintiff cannot base her retaliation claim on the oral reprimand she received from Ms. Harvey because such a minor disciplinary measure does not rise to the level of adverse action necessary to support a *prima facie* case of unlawful retaliation [*Id.* at 29].  Defendant goes on to argue, even if such action does constitute

---

[4] In addition to the arguments highlighted by defendant, plaintiff's response appears to rely in part on her alleged mistreatment by other members of the Loudon Office staff as a retaliatory consequence of her decision to file the EEOC, THRC, and internal Summit Medical complaints that many staff members allegedly perceived as the cause of Dr. Morton's departure. While mistreatment by coworkers can give rise to a hostile work environment claim under certain circumstances, the United States Supreme Court has made clear Title VII was not intended to be a general civility code for the workplace and thus, retaliation claims based on such treatment necessarily fail.  *See Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 925 (W.D. Tenn. 2011) (rejecting retaliation claim based on plaintiff being shunned by co-workers because "petty slights, minor annoyances, and simple lack of good manners" do not rise to the level of actionable adverse action in the retaliation context).

adverse action, plaintiff has failed to present any evidence demonstrating her EEOC and THRC complaints were the "but-for" cause of the reprimand [*Id.* at 30].

Plaintiff responds by arguing the threshold for what constitutes adverse employment action in the retaliation context is lower than that required to support a claim for disparate treatment [Doc. 32 p. 20], and both the oral reprimand by Ms. Harvey and alteration of her annual evaluation score by Dr. Walter surpass the relevant threshold because either would dissuade a reasonable worker from making or supporting a charge of discrimination [*Id.* at 20–21]. Specifically, plaintiff relies on the fact that her "employment file" remained unblemished until after she filed her first EEOC complaint and reported Dr. Morton to Summit Medical Human Resources Department [*Id.* at 21]. Plaintiff also appears to rely on the fact she was never disciplined for her allegedly inappropriate relationship with Mr. Cross, being rude to patients, or her unsatisfactory work performance [*Id.* at 22].

Plaintiff correctly notes that the "burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Caterpillar Fin. Servs. Corp.*, 496 F.3d at 595–96 (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67–68 (2006)). A materially adverse employment action in the retaliation context consists of any action that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Id.* at 77. One consequence of this more liberal definition is that "actions not materially adverse for purposes of an anti-discrimination claim [may] qualify as such in the

36

retaliation context." *Id.*; *see also Burlington N.*, 548 U.S. at 68 (noting supervisor's failure to invite an employee to lunch could, under certain circumstances, amount to materially adverse retaliation action). This lower threshold in the retaliation context, however, is not without limit and only "protects an individual from . . . retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 57. As a result, "de minimis employment actions are not materially adverse and thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

The Court finds plaintiff's receipt of an oral reprimand does not rise to the level of adverse action sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination and thus cannot support a claim of unlawful retaliation. Plaintiff has failed to present any evidence suggesting her oral reprimand gave rise to any significant change in benefits, alternation in responsibilities, or produced any actual injury. *See Russell v. Metro. Nashville Public Schs.*, No. 3-11-0536, 2012 WL 3241664, at *4 (M.D. Tenn. Aug. 7, 2012) (rejecting retaliation claim based on receipt of a written reprimand because such reprimand did not "constitute a significant change in employment status").

In addition to establishing an adverse employment action, plaintiff must demonstrate that protected conduct was the "but-for" cause of the employer's conduct. *See Univ. of Tex. Sw. Med. Ctr. v. Nasser*, 133 S. Ct. 2517, 2533 (2013) (noting "but-for" causation requirement differs from causation standard in the disparate treatment context). "'To establish [the requisite] causal connection, a plaintiff must proffer evidence

sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Caterpillar Fin. Servs. Corp.*, 496 F.3d at 596 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). "'Although temporal proximity itself is insufficient[,] . . . temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a causal connection.'" *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 727 (6th Cir. 2006).

Even assuming the Court were to find plaintiff's oral reprimand exceeded the lower threshold for adverse employment action in the retaliation context, plaintiff has failed to present any evidence upon which a reasonable juror could conclude her EEOC and THRC complaints were the "but-for" cause of her disciplinary sanction. Plaintiff admits she made the comment at issue in a manner loud enough to be heard throughout the work area and it is undisputed Summit Medical Human Resources Department deemed the conduct sanctionable under company policy.

### B. Reductions to 2012 Annual Employee Evaluation

Defendant next argues plaintiff cannot rely on Dr. Walter's alteration of her 2015 annual employee evaluation to establish adverse employment action because plaintiff still received an overall evaluation of "good" and alteration did not reduce the raise she ultimately received [Doc. 31 pp. 30–31]. Defendant goes on to argue, even if such action does constitute adverse employment action, plaintiff has failed to present any evidence demonstrating her EEOC and THRC complaints were the "but-for" cause of Dr. Walter's decision to reduce plaintiff's evaluation scores [*Id.* at 31–32].

38

While it is unclear whether alteration of an employee's annual evaluation score rises to the level of conduct sufficient to dissuade a reasonable worker from filing a claim of discrimination despite the absence of any actual impact on that employee's wage or salary, *see Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 432 (6th Cir. 2007) (remanding for reconsideration, in light of *Burlington Northern*, whether assigning plaintiff a poor performances evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim), the Court finds it need not resolve the issue because plaintiff's claim fails as a matter of law on other grounds.

Plaintiff has failed to present any evidence that would allow a reasonable juror to conclude plaintiff's protected EEOC and THRC conduct was the "but-for" cause of Dr. Walter's decision to reduce her performance scores. Dr. Walter reduced plaintiff's evaluation scores in three areas: (1) exhibits sound clinical skills, (2) adheres to established company policies and procedures, and (3) patient confidentiality [Doc. 25-2 pp. 56–57]. It is undisputed Dr. Walter's reduction of the first two categories from fours to threes was accompanied by notations about performance based issues of plaintiff leaving patients in the lobby too long and being rude to coworkers. Further, plaintiff does not appear to dispute reduction of the third category from four to three merely brought her evaluation in line with Loudon Office policy against awarding scores greater than three for confidentiality. In light of the foregoing, plaintiff has failed to present evidence based upon which a reasonable juror could conclude her filing of EEOC and

39

THRC claims, not the explanations accompanying each score reduction, were the "but-for" cause of Dr. Walter's decision to alter plaintiff's annual evaluation.

### C. Inclusion in February 2013 Reduction-in-Force

Finally, defendant argues plaintiff has failed to present evidence that would allow a reasonable juror to conclude plaintiff's August 27, 2012 and January 8, 2013 EEOC and THRC claims were the "but-for" cause of her inclusion in the February 2013 reduction-in-force [Doc. 31 pp. 32–33].[5] Specifically, defendant argues, aside from temporal proximity, plaintiff has failed to point to any indicia of retaliation suggesting she was included in the reduction-in-force because of her protected conduct [*Id.*].

Plaintiff responds with citation to Dr. Walter's comment about knowing Dr. Morton's departure put plaintiff in a bad place "because [she had] to be feeling a lot of resentment and guilt for what[] happened" [Doc. 32 p. 22], as proof of retaliatory animus.

In addition to the *prima facie* elements required in a standard Title VII retaliation case, a plaintiff claiming retaliation based on inclusion in a reduction-in-force "must present additional direct, circumstantial or statistical evidence tending to indicate that defendant singled out plaintiff for discharge [based on her participation in protected activity]." *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767–68 (6th Cir. 2004).

Even assuming plaintiff were able to establish a *prima facie* case, Dr. Walter and Ms. Loveday articulated legitimate, nondiscriminatory reasons for plaintiff's inclusion in the workforce reduction and shifted the burden back to plaintiff to "produce evidence

---

[5] Plaintiff's third and final THRA claim was not filed until May 20, 2013, several months after her termination by Summit Medical.

sufficient that a reasonable finder of fact could reject [those] proffered [justifications]." *Haughton v. Orchid Automation*, 206 F. App'x 524, 531 (6th Cir. 2006).

A plaintiff "can demonstrate pretext by showing the proffered reason[s] (1) ha[ve] no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) w[ere] insufficient to warrant the challenged conduct." *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). The first type of showing "is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false.'" *Manzer*, 29 F.3d at 1084 (quoting *Anderson v. Baxter Healthcare*, 13 F.3d 1120, 1123–24 (7th Cir. 1994)), *overruled on other grounds by Reeves*, 530 U.S. at 143. The third type is also "easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not terminated even though they engaged in substantially identical conduct." *Id.* Because plaintiff does not attempt to put forth evidence of factual falsity or insufficiency, she necessarily must rely on the second category, actual motive, to establish pretext.

The Court finds plaintiff has failed to put forth evidence sufficient for a reasonable juror to conclude defendant's legitimate proffered justifications did not actually motivate plaintiff's inclusion in the February 2013 reduction-in-force. Plaintiff does not dispute there were three full time physician providers at the Loudon Office when Plaintiff started work in September of 2010 and only one full time physician provider, Dr. Walter,

41

remained by February 2013. Plaintiff does not challenge Dr. Walter's assertion that credentials and seniority were the determinative factors when considering who to terminate or that the total number of individuals selected for termination was determined by reference to the AMGA guidelines regarding provider-to-staff ratios. Plaintiff admits both other staff members included in the workforce reduction were Caucasian and had been at the Loudon Office longer than plaintiff. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009) (finding no need to address whether the plaintiff established a *prima facie* case of retaliation where she failed to create an issue of fact as to pretext for her termination in connection with her discrimination claim).

Accordingly, for the reasons explained above, defendant's motion for summary judgment is **GRANTED** to the extent it seeks dismissal of plaintiff's Title VII and THRA retaliation claims.

## VI.    Plaintiff's State-Law Claims

In addition to the foregoing Title VII and THRA claims, plaintiff alleges liability under the theories of Tennessee common law wrongful and retaliatory discharge as well as pursuant to the Tennessee Public Protection Act ("TPPA").

### A.    Tennessee Common Law Claim

While Tennessee generally adheres to the doctrine of employment-at-will, which recognizes the concurrent rights of either the employer or employee to terminate the employment relationship at any time and for any reason, *see Guy v. Mut. Of Omaha Ins. Co.*, 79 S.W.3d 528, 534–35 (Tenn. 2002), the Tennessee Supreme Court has recognized

42

a limited number of exceptions to the doctrine, including restricting an employer's right to terminate an employee when such action would violate a clearly established public policy. *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555–56 (Tenn. 1988). To survive summary judgment on a Tennessee common law wrongful or retaliatory discharge claim, a plaintiff must present evidence sufficient for a reasonable juror to conclude: (1) an employment-at-will relationship existed; (2) the employee was discharged; (3) the reason for the discharge was either (a) the employee attempted to exercise a statutory or constitutional right, or (b) any other reason that violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) prong three was a "substantial factor" in the employer's decision to discharge the employee. *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 781 (Tenn. 2010), *abrogated on other grounds by* Tenn. Code Ann. § 4-21-211(e); *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714 (Tenn. 1997). The traditional *McDonnell-Douglas* burden shifting framework is applicable.[6]

As discussed in proceeding sections, plaintiff has presented sufficient evidence for a reasonable juror to conclude an employment-at-will relationship existed and plaintiff's inclusion in the February 2012 reduction-in-force amounted to a discharged cognizable by Tennessee common law. Further, plaintiff's status as an African-American female

---

[6] In *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993), the Tennessee Supreme Court adopted the burden-shifting framework of *McDonnell-Douglas*. The court later overruled the *Anderson* decision holding the *McDonnell-Douglas* burden-shifting framework does not apply at the summary judgment stage in Tennessee. *See Gossett*, 320 S.W.3d at 785. The Tennessee General Assembly subsequently enacted Tenn. Code Ann. § 50-1-801, which superseded the court's holding in *Gossett* and reinstated the burden-shifting framework.

43

and allegation that her inclusion in the reduction-in-force was based upon her race-related complaints of discriminatory treatment [Doc. 25-2 pp. 88, 115; Doc. 32 p. 30; Doc. 32-1 p. 32] are sufficient to satisfy the third element of a *prima facie* case. *See Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 26–28 (Tenn. 2011) (operating under conclusion that reporting discriminatory conduct by way of EEOC and THRC is "protected conduct" for purposes of retaliation claim). As a result, the only question remaining is whether plaintiff has presented enough evidence for a reasonable juror conclude plaintiff's numerous THRC and EEOC complaints about race-based discrimination were a "substantial factor" in Summit Medical's decision to terminate plaintiff's employment. The Court finds that a reasonable juror could so conclude.

In contrast to the Title VII and THRA retaliation context, where a plaintiff must demonstrate that her participation in protected activity was the "but for" cause of the relevant adverse employment action, *see Nasser*, 133 S. Ct. at 2533 (explaining differences in language between Title VII mixed motive and retaliation provisions compel conclusion that Title VII retaliation claims require evidence of independent, exclusive causation); *Nguyen*, 229 F.3d at 563 (noting plaintiff must adduce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken if the plaintiffs had not engaged in protected activity); *Hawkins v. Ctr. For Spinal Surgery*, 34 F. Supp. 3d 822, 842 (M.D. Tenn. 2014) (noting Title VII retaliation claim requires proof of "but for" causal link between protected conduct and adverse employment action), Tennessee case law suggests a common law plaintiff need only

44

show protected activity was a "substantial factor" in the employer's discharge decision, *see Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007) (describing fourth element as requiring proof that exercise of statutory or constitutional right was "substantial factor" in employer's decision to discharge employee); *see also Walton v. NOVA, Info. Sys.*, No. 3:06-CV-292, 2008 U.S. Dist. LEXIS 29944, at *48 (E.D. Tenn. April 11, 2008) (same). Thus, while failure to present evidence based upon which a reasonable juror could find pretext is fatal to Title VII and THRA retaliation claims, a plaintiff can prevail under a theory of common-law retaliation by showing her participation in protected activity was just one of multiple motivating factors, so long as it was a "substantial" one.

After careful review of all of the evidence presented in support of plaintiff's claim and construing that evidence in favor of the non-moving party, the Court finds a genuine issue of material fact exists over whether plaintiff's multitude of THRC and EEOC complaints were a "substantial factor" in her inclusion in the 2012 workforce reduction. As a result, defendant's motion is **DENIED** to the extent it seeks dismissal of the common law wrongful and retaliatory discharge claim.

### B.    TPPA Claim

In addition to the common-law actions discussed above, the Tennessee General Assembly adopted a statutory cause of action under the TPPA, commonly referred to as the "Whistleblower Act." Tenn. Code Ann. § 50-1-304(a) (2005). The TPPA provides no employee shall be discharged solely for refusing to participate in or to remain silent

45

about illegal activities. *Id.* Thus, the TPPA gives rise to a claim for relief under two circumstances: (1) discharge in retaliation for refusing to remain silent about illegal activities, usually referred to as "whistleblowing," and (2) discharge in retaliation for refusing to participate in illegal activities. *Williams v. City of Burns*, No. M2012-02423-SC-R11-CV, 2015 Tenn. LEXIS 367, at *25 (Tenn. May 4, 2015). "Illegal activities" covered by the act include state and federal criminal and civil violations, as well as violations of any regulation affecting public health, safety, and welfare. Tenn. Code Ann. § 50-1-304(c). The primary difference between a common law and TPPA cause of action is that a TPPA plaintiff is required to demonstrate her participation in protected activity or refusal to participate in illegal activity was the sole reason for discharge. *Guy*, 79 S.W.3d at 535–37; s*ee also Franklin v. Swift Transp. Co.*, 210 S.W.3d 5212, 530 (Tenn. Ct. App. 2006) (noting the heightened standard under the TPPA stems from the principle that an employee should not be placed in the dilemma of being forced to choose between reporting, or participating in, illegal activities and keeping a job); *see also Darnall v. A+ Homecare, Inc.*, No. 01-A-01-9807-CV-00347, 1999 Tenn. App. LEXIS 339, at *8 (Tenn. Ct. App. June 2, 1999) (Koch, J. concurring) ("The General Assembly's choice of the term 'solely' means that an employee can prevail with a Tenn. Code Ann. § 50-1-304 claim only if he or she can prove that his or her refusal to participate in or to remain silent about illegal activities was the only reason for the termination.").

The Court finds plaintiff has failed to set forth evidence sufficient to (1) convince a reasonable juror that plaintiff was forced to choose between illegalities and continued employment or (2) overcome the heightened TPPA causation requirement.

First, in order to satisfy the second prong of TPPA claim, a plaintiff must point directly to a "contemporaneous fear or threat of dismissal which actually led her to contemplate the choice between remaining silent [about or participating in illegal activity], thereby keeping her job, and reporting illegalities, thereby running the risk of losing her job." *Griggs v. Coca-Cola Emps.' Credit Union*, 909 F. Supp. 1059, 1061 (E.D. Tenn. 1995). Contrary to the foregoing, plaintiff's record is replete with instances where she either openly expressed concern about perceived discriminatory treatment or invoked formal EEOC and THRC reporting procedures. *See Guy v. Mutual of Omaha Ins. Co.*, No. W1999-00942-COA-R9-CV, 2001 Tenn. App. LEXIS 132 (Tenn. Ct. App., Mar. 1, 2001), *aff'd, Guy*, 72 S.W.3d at 535–39 (holding TPPA inapplicable where "accepting plaintiff's version of the facts as true, at the time [he] made [his] report to the Tennessee Department of Commerce and Insurance, he did not . . . face the choice between reporting illegalities and keeping his job"). During her time with the Loudon Office, plaintiff verbally raised her concerns with Mr. Cross multiple times [Doc. 25-2 pp. 68–70], filed two complaints with the THRC [Doc. 25-2 pp. 88, 115], filed on complaint with the EEOC [Doc. 32-1 p. 32], and participated in an internal Summit Medical investigation of the matter [Doc. 25-4 p. 6]. Several supporting documents were sent during working hours with a company cover page and by way of company fax

47

machine [Doc. 25-2 pp. 113–135; Exhibit 11] and plaintiff has not presented any evidence suggesting she was asked or instructed by anyone to remain silent about the alleged illegal activities. In light of the foregoing, the Court finds no reasonable juror could conclude plaintiff has satisfied the second element of a TPPA claim.

Second, plaintiff has not presented evidence sufficient for a reasonable juror to conclude participation in protected activity or refusal to report illegalities was the sole reason for her inclusion in the February 2012 reduction-in-force. While a claim under the theory of common law retaliation only requires plaintiff show retaliation for protected conduct was a "substantial factor" in her termination, the TPPA requires proof retaliation for protected conduct was the sole reason behind the employer's discharge decision. *Williams*, 2015 Tenn. LEXIS 367, at *27. As discussed in previous sections, plaintiff cannot meet this heighted causation standard. *See Williams*, 2015 Tenn. LEXIS 367, at *40 (noting employer avoids TPPA liability by offering evidence that at least one non-retaliatory reason existed for discharge); *Bright v. MMS Knoxville, Inc.*, No. M2005-02668-COA-R3-CV, 2007 Tenn. App. LEXIS 510, *10–11 (Tenn. Ct. App. Aug. 7, 2007) (noting "[w]histleblower protection is intended to remain a narrow exception to the at-will employment doctrine"). Plaintiff does not dispute there were three full time physician providers at the Loudon Office when plaintiff started work in September of 2010 and only one full time physician provider, Dr. Walter, remained by February 2013 [Doc. 25-2 p. 71; Doc. 25-3 p. 22]. Plaintiff does not challenge Dr. Walter's assertion that credentials and seniority were the determinative factors when considering who to

48

terminate or that the total number of individuals selected for termination was determined by reference to the AMGA guidelines regarding provider-to-staff ratios [Doc. 25-4 pp. 19–20]. Plaintiff admits both the other staff members included in the workforce reduction were Caucasian and had been at the Loudon Office longer than plaintiff [Doc. 25-2 pp. 71–72; Doc. 25-3 pp. 22–23]. Thus, because the Court finds she has failed to present evidence which would allow a reasonable juror to find in her favor on the TPPA claim, defendant's motion for summary judgment on plaintiff's claim pursuant to Tenn. Code Ann. § 50-1-304 is **GRANTED**.

## VII. Conclusion

For the reasons stated herein, defendant Summit Medical Group, PLLC's Motion for Summary Judgment [Doc. 25] is **GRANTED in part** and **DENIED in part**. Plaintiff's Title VII and THRA disparate treatment and retaliation claims are **DISMISSED WITH PREJUDICE**. Plaintiff's TPPA claim is **DISMISSED WITH PREJUDICE** as well. Defendant's motion [Doc. 25] is **DENIED** however to the extent it seeks dismissal of plaintiff's Title VII and THRA hostile work environment claims or plaintiff's common law retaliatory discharge claim.

**IT IS SO ORDERED.**


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

49